MEHRI & SKALET PLLC
RICHARD E. CONDIT (*pro hac vice*)
CLEVELAND LAWRENCE III (*pro hac vice*)
MEREDITH CRAFTON (*pro hac vice*)
1717 K Street, NW, Suite 900
Washington, DC 20006
Tel: 202.822.5100
Fax: 202.822.4997
rcondit@findjustice.com
clawrence@findjustice.com
mcrafton@findjustice.com

LAURA L. HO (SBN 173179)
lho@dhkl.law
JAMES KAN (SBN 240749)
jkan@dhkl.law
DARDARIAN, HO, KAN & LEE
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel: (510) 763-9800

*Attorneys for Plaintiff Adnan Tahir*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

ADNAN TAHIR,

Plaintiff,

vs.

PAYWARD, INC., a Delaware corporation; and PAYWARD VENTURES, INC., a Delaware corporation d/b/a KRAKEN,

Defendants.

Case No.

**COMPLAINT FOR:**

**(1) Whistleblower Retaliation Under the Anti-Money Laundering Act, 31 U.S.C. § 5323(g) and**

**(2) Whistleblower Retaliation Under the Consumer Financial Protection Act, 12 U.S.C. § 5567.**

**DEMAND FOR JURY TRIAL**

Plaintiff Adnan Tahir, by and through his undersigned counsel, brings this action against Defendants Payward, Inc. and Payward Ventures, Inc. d/b/a Kraken (collectively, "Kraken" or "Defendants"), and alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for whistleblower retaliation under the employee-protection provision of the Anti-Money Laundering Act of 2020 ("AMLA"), 31 U.S.C. § 5323(g), and the employee-protection provision of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5567. Plaintiff Adnan Tahir, a financial compliance professional, was engaged by Defendants to conduct financial investigations and Bank Secrecy Act ("BSA") compliance work for Kraken, one of the world's largest cryptocurrency exchanges.

2. Over the course of his engagement, Mr. Tahir discovered pervasive and serious violations of the BSA and its implementing regulations — including failures to implement an adequate Know Your Customer ("KYC") program, failures to file Suspicious Activity Reports ("SARs") with the Financial Crimes Enforcement Network ("FinCEN"), inadequate sanctions screening, and systemic exposure of customer data through insecure means. Mr. Tahir repeatedly reported these violations to his supervisors and senior management, including Kraken's Chief Operating Officer and Chief Compliance Officer.

3. In response to his protected disclosures, Defendants retaliated against Mr. Tahir by, among other things, compromising his access to company systems in breach of their contractual obligation to provide him with a properly functioning laptop, subjecting him to a pretextual performance evaluation, placing him on involuntary administrative leave, and ultimately terminating his engagement on November 1, 2022 — thirteen days after Kraken sent him a formal written email acknowledging and purporting to respond to his protected whistleblower disclosures.

4. Mr. Tahir timely exhausted his administrative remedies. The Secretary of Labor did not issue a final decision within the periods prescribed by 31 U.S.C. § 5323(g)(2)(B) and 12 U.S.C. § 5567(c)(4)(D), and the delay is not attributable to any bad faith on Mr. Tahir's part. Mr. Tahir is therefore entitled to bring this action de novo in federal district court.

**JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question). Jurisdiction over the AMLA claim is further conferred by 31 U.S.C. § 5323(g)(2)(B), and jurisdiction over the CFPA claim is further conferred by 12 U.S.C. § 5567(c)(4)(D)(i); each provision vests the district court with jurisdiction over the action without regard to the amount in controversy.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Mr. Tahir's claims occurred in this District. During the relevant time period, Defendants maintained their principal place of business and headquarters in San Francisco, California, from which they directed Mr. Tahir's engagement and made and communicated the retaliatory decisions at issue, including the decision to terminate his engagement.

7. This Court has personal jurisdiction over Defendants because Defendants regularly conduct business in Northern California and Payward, Inc remains registered in the State to do so. Defendants also were headquartered in and maintained their principal place of business in this District during the relevant time period and until 2025. Members of Defendants' leadership team continue to reside in and direct the company from Northern California.

**PARTIES**

8. Plaintiff Adnan Tahir is an individual and a citizen of Canada who provided compliance services to Defendants through his company, ComplyChain Solutions, pursuant to a Consulting Agreement dated August 4, 2020 (the "Consulting Agreement"). At all relevant times, Mr. Tahir performed his services remotely from New York City and other locations, as expressly permitted by the Consulting Agreement. Mr. Tahir is a financial compliance professional with extensive expertise in BSA/AML compliance, financial investigations, and Suspicious Activity Report filings.

9. Defendant Payward, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 237 Kearny Street, #102, San Francisco, California 94108 until 2025 when Payward, Inc, relocated its headquarters to Cheyenne, WY. Payward, Inc. remains a registered California business with a California Registered Corporate Agent, United Agent

Group, Inc. at 7801 Folson Blvd, STE 202, Sacramento, CA. Payward, Inc. was the contracting party under the Consulting Agreement and is an "employer" within the meaning of 31 U.S.C. § 5323(g).

10. Defendant Payward Ventures, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 237 Kearny Street, #102, San Francisco, California 94108 until 2025. Payward Ventures, Inc. operates the Kraken cryptocurrency exchange and does business under the trade name “Kraken.” At all relevant times, Payward Ventures, Inc. directed and benefited from Mr. Tahir's services and is an "employer" within the meaning of 31 U.S.C. § 5323(g).

11. Defendants Payward, Inc. and Payward Ventures, Inc. (collectively, "Kraken") operate together as an integrated enterprise engaged in the business of a cryptocurrency exchange platform. Kraken is registered with FinCEN as a Money Services Business ("MSB") and money transmitter. Kraken operates throughout the United States, including in all fifty states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Guam, and holds state money-transmitter licenses across the United States.

## FACTUAL ALLEGATIONS

### A. Kraken's Business and Regulatory Obligations

12. Kraken is one of the world's largest cryptocurrency exchanges, providing customers a platform to buy, sell, and trade digital assets, including Bitcoin and other cryptocurrencies. Kraken serves customers throughout the United States and internationally.

13. As a registered MSB and money transmitter, Kraken is subject to the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations at 31 C.F.R. Part 1022. The BSA requires Kraken, among other things, to: (a) establish and implement an effective written anti-money laundering ("AML") program; (b) implement and maintain a Customer Identification Program and KYC procedures; (c) file SARs with FinCEN when a transaction involves or aggregates to at least $2,000 and the MSB knows, suspects, or has reason to suspect that the transaction involves funds derived from illegal activity, is designed to evade BSA reporting requirements, has no apparent lawful purpose, or is being used to facilitate criminal activity; and (d) maintain and implement effective sanctions-screening programs to prevent dealings with sanctioned persons and jurisdictions in

accordance with regulations administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").

14. As a consumer-facing financial-services platform, Kraken offers and provides "consumer financial products or services" within the meaning of the Consumer Financial Protection Act, 12 U.S.C. § 5481, and is a "covered person" and a "service provider" subject to that Act.

**B. Mr. Tahir's Engagement and Compensation**

15. Pursuant to the Consulting Agreement dated August 4, 2020 — signed on behalf of Payward, Inc. by David Ripley in San Francisco, CA in his capacity as Chief Operating Officer — Mr. Tahir was engaged through his entity ComplyChain Solutions to perform financial investigations and other compliance services for Kraken. The Consulting Agreement expressly provided that Mr. Tahir would perform services at the location of his preference. Mr. Ripley is now the CEO of Payward, Inc. and he continues to reside in and conduct business from San Francisco.

16. Under the Consulting Agreement, Mr. Tahir received compensation of $6,666.66 per month. He was also granted an option to purchase 10,000 shares of Payward, Inc. common stock under the company's 2011 Stock Plan, with one-sixth of the shares vesting on the one-year anniversary of his start date and the remaining shares vesting in equal monthly installments of one-seventy-second thereafter during continuous service. As a result of Defendants' unlawful termination of his engagement on November 1, 2022, Mr. Tahir forfeited stock options that would otherwise have continued to vest.

17. Under Section 6 of the Consulting Agreement, Kraken was expressly obligated to provide Mr. Tahir with a company-issued, company-configured laptop for use in conducting Kraken's business, and Mr. Tahir was required to use only that device in performing his services. Mr. Tahir's responsibilities included conducting financial investigations, analyzing transactions for suspicious activity, filing SARs with FinCEN, performing customer due diligence, and otherwise assisting Kraken in meeting its BSA/AML compliance obligations.

18. Although the Consulting Agreement characterized Mr. Tahir as an independent contractor providing services through ComplyChain Solutions, that label does not control the application of the whistleblower-protection statutes at issue, both of which protect covered individuals

regardless of formal employment classification. Consistent with this, the Confidential Information and Invention Assignment Agreement that formed part of Mr. Tahir's engagement expressly acknowledged that a court or government agency might determine that his relationship with Kraken constituted employment rather than independent contracting, and provided that such a determination would not render the parties' agreements unenforceable.

19. Mr. Tahir's direct supervisor was Kenny Borthwick, Kraken's Financial Intelligence Unit ("FIU") Team Lead. Additional personnel with authority over his engagement included David Zacks, Vice President and Deputy Chief Compliance Officer ("CCO") – who, because Kraken lacked a dedicated, permanent Chief Compliance Officer (“CCO”) during much for Mr. Tahir’s engagement, effective served as Kraken’s most senior compliance decision-maker; Ian Mynot, Senior FIU Manager; and David L. Ripley, Chief Operating Officer and later Chief Executive Officer — the same individual who had executed the Consulting Agreement on behalf of Payward, Inc. and who was aware of the nature and scope of Mr. Tahir's financial investigations work.

**C. Mr. Tahir's Discovery and Reporting of BSA/AML Violations**

20. Throughout his engagement, Mr. Tahir identified and disclosed to Kraken's management numerous deficiencies in Kraken's compliance with the BSA and its own compliance obligations. These disclosures constituted protected activity under 31 U.S.C. § 5323(g) and 12 U.S.C. § 5567.

21. *Lack of Compliance Manual and Training.* Mr. Tahir disclosed to his supervisors that Kraken lacked a complete compliance manual and an adequate training program for its compliance and FIU personnel, contrary to the BSA's requirement that MSBs maintain an effective written AML program.

22. *Inadequate KYC and Customer Identification.* Mr. Tahir disclosed that Kraken's KYC program was deficient in material respects, including that Kraken maintained accounts for customers whose KYC documentation was incomplete or had expired without renewal, and that Kraken lacked adequate customer-identification procedures, contrary to the BSA's Customer Identification Program requirements.

23. *Insecure Handling of Customer Data.* Between July 14 and July 19, 2022, Mr. Tahir raised concerns to his team lead and in team meetings that Kraken's FIU compliance team was over-reliant on manual spreadsheets and that too many Kraken personnel had access to files containing Personally Identifiable Information ("PII"). On July 19, 2022, FIU Senior Manager Ian Mynot met with Mr. Tahir and acknowledged that the FIU team was then dependent on manual processes as it continued to scale. Mr. Tahir also disclosed to management, including to COO David Ripley in or around July 2022, that highly sensitive customer data — including PII and financial-account details — was being stored and shared through unencrypted Google Drive spreadsheets accessible to Kraken employees globally without adequate access controls. Mr. Tahir further reported that Kraken customer-account information was appearing for sale on the dark web, indicating a potential data breach. These deficiencies jeopardized the confidentiality of customer information and the integrity of Kraken's AML program.

24. *Suspicious Activity Report Deficiencies.* Mr. Tahir disclosed that Kraken was failing to file SARs in the correct jurisdictions and was not filing SARs on accounts exhibiting clear indicators of suspicious activity. On August 26, 2022, Mr. Tahir escalated specific concerns, in a team meeting and by direct message to his team lead, regarding SAR reporting for Kraken's British Virgin Islands ("BVI") entity — specifically that the BVI entity was requiring a Money Laundering Reporting Officer to sign off on SAR reports without proper authority or delegation. These failures were contrary to the SAR requirements of 31 U.S.C. § 5318(g) and the MSB regulations at 31 C.F.R. § 1022.320.

25. *Accounts Linked to High-Risk Activity.* Mr. Tahir disclosed that Kraken was maintaining open accounts for customers exhibiting clear indicia of illicit finance, including accounts linked to cryptocurrency mixer or "tumbler" wallets, darknet-market wallets, and privacy coins that impede transaction tracing. Notwithstanding these red flags, Kraken failed to file SARs or close such accounts, in certain instances because management prioritized revenue over compliance.

26. *Inadequate Sanctions Screening.* Mr. Tahir disclosed that Kraken lacked adequate Politically Exposed Person and High-Risk Individual and Organization lists, and that its sanctions-screening program was insufficient to detect and block transactions involving sanctioned individuals, entities, or jurisdictions as required under applicable OFAC regulations.

27. *Absence of Effective Compliance Leadership and Infrastructure.* Mr. Tahir disclosed that Kraken lacked a designated, permanent CCO for much of his engagement, and that Kraken had no functional case-management system. Rather than any dedicated case-management software, Kraken's tracking of suspicious-activity investigations and SAR filings depended entirely on manual spreadsheets and shared Google Drive folders, which created significant data-security and case-tracking risks. These structural failures meant that Kraken's AML program lacked the leadership and oversight infrastructure required by the BSA.

28. *Senior-Management Disclosures.* In or around July 2022, Mr. Tahir met directly with David Ripley — who had personally signed the Consulting Agreement as Kraken's COO — and disclosed his concerns regarding Kraken's data-security failures and BSA-compliance deficiencies. In or around August and September 2022, Mr. Tahir met with Deputy CCO David Zacks and disclosed further concerns about Kraken's systemic compliance failures. Mr. Tahir made each of these disclosures in good faith, based on his reasonable belief that Kraken was violating the BSA and related laws and regulations.

**D. Kraken's Retaliatory Conduct**

29. Kraken did not respond to Mr. Tahir's protected disclosures by remedying the compliance failures he identified. Instead, Defendants embarked on a course of retaliatory conduct intended to marginalize, punish, and ultimately terminate Mr. Tahir because of his protected whistleblower activity.

30. *Sabotage of System Access.* In or around July and August 2022 — coinciding with Mr. Tahir's escalating disclosures, including his meeting with COO Ripley — Kraken failed to maintain Mr. Tahir's access to the computing equipment and systems necessary to perform his work. When Mr. Tahir's company-issued laptop became dysfunctional, Kraken, in breach of its obligation under Section 6 of the Consulting Agreement to provide a properly configured laptop, issued him a defective replacement device and failed to restore his access credentials to company systems. As a result, Mr. Tahir was unable to perform the full scope of his duties for an extended period.

31. *Pretextual Performance Evaluation.* In late September 2022, Kraken subjected Mr. Tahir to an unscheduled negative performance evaluation covering only the period during which he

had been deprived of functioning equipment and full system access — a circumstance of Kraken's own making. The evaluation was pretextual and was manufactured to create a paper record purporting to justify further adverse action against Mr. Tahir.

32. *Involuntary Administrative Leave.* On October 6, 2022, Kraken sent Mr. Tahir a formal email from its HR Outreach department stating that Payward was placing him on a period of paid leave while it completed an investigation, and that his access to company equipment and IT systems had been temporarily suspended. The email was directed simultaneously to Mr. Tahir's personal email address and his ComplyChain Solutions business address, confirming Defendants' awareness of his professional identity. Kraken did not disclose the subject matter of the investigation or any basis for suspending his access. A follow-up email on October 10, 2022 confirmed that Mr. Tahir's agreement had not been terminated but reminded him that he remained under a duty to be reasonably available. The suspension of all equipment and system access left Mr. Tahir unable to work and cut off from company resources, including the mental-health benefits platform through which he had been receiving coaching and therapy services.

33. *Whistleblower Response Email.* On October 19, 2022 — thirteen days before Mr. Tahir's termination — Kraken's HR Outreach department sent Mr. Tahir a formal written email bearing the subject line "Whistleblower Response | Payward" (the "Whistleblower Response"). The email represented that Kraken had reviewed, investigated, and addressed his concerns in consultation with Kraken's legal team, and characterized the correspondence as a full and complete response to his disclosures under Kraken's internal Whistleblower and Complaint Policy. The Whistleblower Response acknowledged specific categories of concerns Mr. Tahir had raised, including his August 26, 2022 escalation of concerns about SAR reporting for Kraken's BVI entity and the authority of its Money Laundering Reporting Officer, and his July 14-19, 2022 concerns about Kraken's over-reliance on manual spreadsheets and excessive employee access to files containing customer PII. The Whistleblower Response did not address the broader BSA/AML compliance failures Mr. Tahir had reported, including deficient KYC programs, systemic SAR non-filing, accounts linked to mixer wallets and darknet markets, and inadequate sanctions screening. The Whistleblower Response constitutes direct, contemporaneous evidence that Kraken and its legal team had investigated and were

fully aware of Mr. Tahir's protected disclosures at the time Defendants decided to terminate his engagement.

34. *Termination.* On November 1, 2022 — thirteen days after the Whistleblower Response — Defendants terminated Mr. Tahir's engagement. The close temporal proximity between Kraken's formal written acknowledgment of Mr. Tahir's protected whistleblower activity and his termination is powerful evidence of retaliatory intent.

35. The adverse actions described above — including the compromise of Mr. Tahir's system access in breach of Kraken's contractual equipment obligation, the pretextual performance evaluation, the involuntary administrative leave, and the termination — were taken because of, and as a result of, Mr. Tahir's protected disclosures regarding Kraken's BSA/AML violations. Mr. Tahir's protected activity was a contributing factor in each adverse action.

**E. Damages**

36. As a direct and proximate result of Defendants' unlawful retaliation, Mr. Tahir has suffered and continues to suffer substantial damages, including lost past and future consulting fees and other compensation; forfeiture of unvested stock options in Payward, Inc. common stock that would have continued to vest but for the unlawful termination; lost professional opportunities and career advancement; damage to his professional reputation; and significant emotional distress. The suspension of Mr. Tahir's company accounts also severed his access to the mental-health benefits platform through which he had been receiving coaching and therapy, compounding the emotional and psychological harm caused by Defendants' conduct.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

37. On or about January 1, 2023 — within 180 days of the November 1, 2022 termination and of the earlier retaliatory acts against him — Mr. Tahir filed a complaint with the U.S. Department of Labor alleging retaliation in violation of the whistleblower-protection provisions of the AMLA and the CFPA. The Department of Labor deemed the complaint timely filed.

38. The Department of Labor initially mis-routed Mr. Tahir's complaint to the California Division of Occupational Safety and Health (Cal/OSHA), which did not refer the matter back to the appropriate federal agency. Mr. Tahir bore no responsibility for this administrative error. After

retaining counsel, Mr. Tahir filed a First Amended Complaint with the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA"), Whistleblower Protection Program on January 12, 2024, docketed as OSHA Case No. 301029495.

39. On May 27, 2026, OSHA issued Secretary's Findings concluding that there was no reasonable cause to believe Defendants had violated the AMLA or the CFPA. The Secretary of Labor has not issued a final decision or order in this matter.

40. Because the Secretary of Labor did not issue a final decision within 180 days of the filing of Mr. Tahir's complaint, and the delay is not attributable to any bad faith on Mr. Tahir's part, Mr. Tahir is entitled to bring a de novo action in this Court on his AMLA claim pursuant to 31 U.S.C. § 5323(g)(2)(B).

41. Because the Secretary of Labor did not issue a final order within 210 days of the filing of Mr. Tahir's complaint, and the delay is not attributable to any bad faith on Mr. Tahir's part, Mr. Tahir is entitled to bring a de novo action in this Court on his CFPA claim pursuant to 12 U.S.C. § 5567(c)(4)(D)(i).

42. Mr. Tahir has satisfied all administrative prerequisites to bringing this action.

**COUNT I**
**Violation of the Anti-Money Laundering Act Whistleblower Protection Provision, 31 U.S.C. § 5323(g) (Against All Defendants)**

43. Mr. Tahir re-alleges and incorporates by reference each preceding paragraph as if fully set forth herein.

44. The AMLA prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower to provide information regarding conduct the whistleblower reasonably believes constitutes a violation of any law, rule, or regulation subject to the jurisdiction of the Department of the Treasury, including the BSA, to a person with supervisory authority over the whistleblower or to another person working for the employer with authority to investigate, discover, or terminate the misconduct. 31 U.S.C. § 5323(g)(1).

45. Mr. Tahir is a "whistleblower" within the meaning of 31 U.S.C. § 5323(g)(1) and the special rule of 31 U.S.C. § 5323(a)(5)(B), because he provided information regarding conduct he

reasonably believed to violate the BSA and its implementing regulations to persons with supervisory authority over him and to others at Kraken with authority to investigate or address the misconduct. The AMLA's whistleblower protections apply whether or not Mr. Tahir was classified as an employee or an independent contractor.

46. Defendants are "employers" within the meaning of 31 U.S.C. § 5323(g). Defendants are entities registered with FinCEN as money services businesses and money transmitters subject to the BSA, and they engaged Mr. Tahir to perform BSA/AML compliance work.

47. Mr. Tahir engaged in protected activity under 31 U.S.C. § 5323(g)(1) by disclosing to his supervisors, managers, and senior executives information regarding conduct he reasonably believed to violate the BSA and its implementing regulations, including Kraken's failure to maintain an adequate AML program, its KYC deficiencies, its failure to file required SARs, its inadequate sanctions screening, and its insecure handling of customer data. Mr. Tahir made these disclosures in good faith.

48. Defendants knew of Mr. Tahir's protected disclosures. Kraken acknowledged his whistleblower activity in its October 19, 2022 Whistleblower Response email, and COO David Ripley — who had personally contracted with Mr. Tahir and was aware of the scope of his compliance work — received Mr. Tahir's disclosures directly in or around July 2022.

49. Defendants took multiple adverse actions against Mr. Tahir because of his protected disclosures, including failing to maintain his company-issued laptop and system access in breach of Section 6 of the Consulting Agreement; subjecting him to a pretextual negative performance evaluation; placing him on involuntary administrative leave; and terminating his engagement on November 1, 2022.

50. Mr. Tahir's protected activity was a contributing factor in the adverse actions Defendants took against him. The close temporal proximity between Kraken's October 19, 2022 Whistleblower Response and Mr. Tahir's November 1, 2022 termination, together with the pretextual nature of Defendants' stated justifications, demonstrates that Defendants' true motivation was retaliation for Mr. Tahir's protected whistleblower activity. Defendants cannot demonstrate by clear

and convincing evidence that they would have taken the same actions in the absence of Mr. Tahir's protected activity.

51. Defendants' conduct violated 31 U.S.C. § 5323(g)(1).

52. As a result of Defendants' violation, Mr. Tahir is entitled to all relief necessary to make him whole pursuant to 31 U.S.C. § 5323(g)(3)(C), including reinstatement with the same seniority status he would have had absent the retaliation; two times the amount of back pay otherwise owed, with interest; compensatory damages, including compensation for litigation costs, expert witness fees, and reasonable attorneys' fees; and any other appropriate remedy.

**COUNT II**
**Violation of the Consumer Financial Protection Act Whistleblower Protection Provision, 12 U.S.C. § 5567 (Against All Defendants)**

53. Mr. Tahir re-alleges and incorporates by reference each preceding paragraph as if fully set forth herein.

54. The CFPA provides that no covered person or service provider shall terminate or in any other way discriminate against any covered employee because the employee provided information to the employer, the Consumer Financial Protection Bureau (the "Bureau"), or any other government authority relating to any violation of, or any act or omission the employee reasonably believes to be a violation of, any provision of law subject to the jurisdiction of the Bureau, or any rule, order, standard, or prohibition prescribed by the Bureau. 12 U.S.C. § 5567(a).

55. Defendants are "covered persons" and "service providers" within the meaning of 12 U.S.C. § 5481(6) and (26) because they offer and provide consumer financial products and services, including cryptocurrency-exchange and money-transmission services, directly to consumers in the United States.

56. Mr. Tahir is a "covered employee" within the meaning of 12 U.S.C. § 5567(b) because he performed tasks related to the offering or provision of consumer financial products and services, including compliance work designed to protect the integrity of those services. The CFPA's whistleblower protection applies whether or not Mr. Tahir was classified as an employee or an independent contractor.

57. Mr. Tahir engaged in protected activity under 12 U.S.C. § 5567(a) by disclosing to his supervisors and management information he reasonably believed evidenced violations of law subject to the Bureau's jurisdiction, including Kraken's failure to adequately protect consumer financial data, its deficient identity-verification and KYC practices, and other compliance failures directly affecting consumers.

58. Defendants knew of Mr. Tahir's protected disclosures and acknowledged them in the October 19, 2022 Whistleblower Response email.

59. Defendants took multiple adverse actions against Mr. Tahir because of his protected disclosures, including failing to maintain his company-issued equipment in breach of Section 6 of the Consulting Agreement; subjecting him to a pretextual performance evaluation; placing him on involuntary administrative leave; and terminating his engagement.

60. Mr. Tahir's protected activity was a contributing factor in the adverse actions Defendants took against him, and Defendants cannot demonstrate by clear and convincing evidence that they would have taken the same actions in the absence of Mr. Tahir's protected activity.

61. Defendants' conduct violated 12 U.S.C. § 5567(a).

62. As a result of Defendants' violation, Mr. Tahir is entitled to all relief necessary to make him whole pursuant to 12 U.S.C. § 5567(c)(4)(D)(ii), including reinstatement with the same seniority status he would have had absent the discrimination; back pay, with interest; and compensation for special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Adnan Tahir respectfully requests that this Court enter judgment in his favor and against Defendants Payward, Inc. and Payward Ventures, Inc. d/b/a Kraken, jointly and severally, and award the following relief:

A. A declaration that Defendants' conduct violated the whistleblower-protection provision of the AMLA, 31 U.S.C. § 5323(g), and the whistleblower-protection provision of the CFPA, 12 U.S.C. § 5567;

B. An order requiring Defendants to reinstate Mr. Tahir with the same seniority, pay, and benefits he would have had absent the unlawful retaliation, or, in the alternative, front pay in lieu of reinstatement;

C. An award of two times the amount of back pay otherwise owed, with interest, pursuant to 31 U.S.C. § 5323(g)(3)(C)(ii), for Defendants' violation of the AMLA;

D. An award of back pay, with interest, pursuant to 12 U.S.C. § 5567(c)(4)(D)(ii)(II), for Defendants' violation of the CFPA;

E. An award of compensatory and special damages sustained by Mr. Tahir as a result of Defendants' unlawful conduct, including damages for the forfeiture of unvested stock options, lost professional opportunities, harm to professional reputation, and emotional distress, in an amount to be determined at trial;

F. An award of litigation costs, expert witness fees, and reasonable attorneys' fees pursuant to 31 U.S.C. § 5323(g)(3)(C)(iii) and 12 U.S.C. § 5567(c)(4)(D)(ii)(III);

G. Pre-judgment and post-judgment interest as permitted by law; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), 31 U.S.C. § 5323(g)(3)(B)(i), and 12 U.S.C. § 5567(c)(4)(D)(i), Plaintiff Adnan Tahir demands a trial by jury on all issues so triable.

Dated: November 23, 2026

Respectfully submitted,

*/s/ James Kan*
James Kan

Laura L. Ho (SBN 173179)
lho@dhkl.law
James Kan (SBN 240749)
jkan@dhkl.law
DARDARIAN, HO, KAN & LEE
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel: (510) 763-9800

Richard E. Condit (pro hac vice)
Cleveland Lawrence III (pro hac vice)
Meredith Crafton (pro hac vice)
MEHRI & SKALET PLLC
1717 K Street, NW, Suite 900
Washington, DC 20006
Tel: (202) 822-5100
Fax: (202) 822-4997
rcondit@findjustice.com
clawrence@findjustice.com

*Attorneys for Plaintiff Adnan Tahir*